IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| EDDIE HOWARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-00628-CV-W-HFS |
| ) | |
| KANSAS CITY POLICE DEPARTMENT, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

Before the court is defendants' second motion for summary judgment.[1] Defendants include the Kansas City, Missouri Police Department; Police Officers Ryan Bronner, Mike Sartain, and Michael Galley; the Board of Police Commissioners through its members in their official capacity Angela Wasson-Hunt, Karl Zobrist, James Wilson, Terry Brady, and Kay Barnes.

In his amended complaint, plaintiff, Eddie Howard, has asserted the following claims: in Count I, he alleges excessive force by Police Officer Ryan Bronner pursuant to 42 U.S.C. § 1983; in Count II, plaintiff repeats this claim against Police Officer Mike Sartain; in Count III, the claim is repeated against Police Officer Michael Galley;[2] and in Count IV, plaintiff alleges failure to

---

[1] Defendants previously filed a motion for summary judgment on July 2, 2007 (doc. 25). However, plaintiff then sought leave to file an amended complaint (doc. 26), and an extension of time to serve the newly named defendants (doc. 32); said leave was granted and the complaint, as amended, was filed on September 21, 2007 (doc. 39). Due to the amended complaint, defendants filed a second motion for summary judgment. Thus, the initial motion was denied as moot.

[2] However, to-date, Officer Galley has not been served within 120 days of the filing of the amended complaint. Pursuant to Fed.R.Civ.P. 4(m), the action is dismissed as to this defendant.

instruct, supervise, control, and discipline against the Board of Police Commissioners pursuant to 42 U.S.C. § 1983.

I. Background Facts

Plaintiff states that on July 27, 2002, at approximately 4:45 p.m., he was shot in the upper left arm while sitting in his car at a stop light in Kansas City, Missouri. (Amended Complaint: ¶¶ 18-21).[3] In an attempt to flee the assailants, who gave chase, plaintiff drove westbound on 12th Street at a high rate of speed when he spotted a police cruiser and attempted to get its attention by honking and swerving. (Id: ¶ 22-24). Police Officer Michael Galley observed plaintiff's speeding car, and a green Mitsubishi Mirage chasing it; he activated his emergency lights and sirens and began to pursue the speeding vehicles. (Id: ¶25). From 12th Street, plaintiff turned onto Indiana until he reached 18th Street where he turned east; he then drove around a post office and returned to Indiana driving in a southbound direction. (Id: ¶ 26). Plaintiff was becoming light-headed from the loss of blood, and decided to stop and attempt to flee on foot. (Id: ¶ 30). Plaintiff turned onto 20th Street, abandoned his vehicle, ran across a vacant lot, and climbed a fence; plaintiff saw a police officer and attempted to flag him down. (Id: ¶¶ 29, 32). The occupants of the other car sped away. (Id: ¶ 33).

---

It is further noted that while the Kansas City, Missouri Police Department is listed as a defendant in the caption of the amended complaint, plaintiff does not assert any claims against this entity, and, therefore fails to state a claim upon which relief can be granted.

[3]This allegation is repeated in his affidavit. (Plaintiff's Exh. A, ¶ 2). However, at his deposition plaintiff testified that the information was incorrect because he was not shot at a stoplight, but rather while he sat in his car in front of a friend's house. (Defendants' Exh. G, pg. 191-92).

2

Other police officers, including Officers Bronner and Sartain arrived at the scene, and joined Officer Galley. (Id: ¶ 34). The police officers drew their weapons, and pushed plaintiff, who was shirtless, to the asphalt street. (Id: ¶¶ 35-36). According to plaintiff, on that date the temperature reached the low 100s Fahrenheit, and local weather forecasters had issued a heat advisory. (Id: ¶¶ 38-39). Plaintiff also states that the officers were aware of the heat because they had been using the air conditioning units in their vehicles. (Id: ¶¶ 40-42). Despite plaintiff's attempts to scramble to his feet and his pleas about the hot asphalt, the officers refused to allow him to sit on the nearby grass or in one of the patrol cars. (Id: ¶¶ 43-46). Plaintiff claims that although he alerted the officers that his back was burning, acting together, they exerted great physical force to restrain him on the burning asphalt. (Id: ¶¶ 47-51). The officers questioned plaintiff about who shot him, and continued to restrain him on the burning asphalt until a MAST ambulance arrived; they also yelled and cursed at him, and threatened him with bodily harm. (Id: ¶¶ 52-53).

Plaintiff states that when permitted to get up, some of his skin remained stuck to the asphalt, and he had to be treated for third degree burns on his arms, back, shoulders, neck, and upper buttocks. (Id: ¶¶ 54-56). Plaintiff was treated at Truman Medical Center for both the gunshot wound and the burns, and he suffered burning, blistering, swelling, debridement of burned flesh, and permanent scarring as a result of the officers' conduct. (Id: ¶ 57). Plaintiff also claims to suffer from keloid scarring, severe emotional distress, post traumatic stress, fear, anxiety, depression, constant pain on and around the skin due to inelasticity of the skin, and a heightened level of temperature sensitivity. (Id: ¶ 58). Plaintiff further claims that he was not violent and did not threaten the officers at any time during the seizure. (Id: ¶ 60).

3

For the most part, defendants do not dispute plaintiff's recitation of the facts, but have stated additional facts. For instance, defendants state that Officer Galley was issuing a citation to another vehicle when he initially observed the car being driven by plaintiff, a Chevy Camaro, and a second car, a green Mitsubishi Mirage, being driven at a high rate of speed. (Defendants' SOF: ¶ 6). Entrant Officer Pruitt was riding with Officer Galley that day. (Id: ¶ 7). Although Officer Galley gave chase, he lost sight of the vehicles, and put out a call on his radio regarding the chase. (Id: ¶¶ 8-9). Upon observing the Camaro and Mitsubishi again, Officer Galley pursued the vehicles, and ultimately arrived at 20th and Indiana Streets with other officers where the chase between plaintiff and his attackers concluded. (Id: ¶¶ 10, 13).

When Officers Bronner and Sartain arrived at the scene, they observed plaintiff lying in the street, Officer Galley standing near him, and 2 other men standing nearby. (Id: ¶ 14). Officer Galley explained that plaintiff wrecked the car after driving into a fence that faced south toward 20th Street. (Id). While still at the scene, Officer Galley determined that the car driven by plaintiff was previously reported as stolen. (Id: ¶ 15).[4] Officers Bronner and Sartain noticed that plaintiff was bleeding profusely from the gunshot wound to his upper left arm, and that he seemed to slip in and out of consciousness; they remained with plaintiff while Officer Galley spoke with the 2 by-standers, Calvin and Marco Maddox. (Id: ¶¶ 16, 21). Officers Bonner and Sartain were unsure what, if any,

---

[4]Plaintiff testified that he was told about the car by a friend called "Bootyman" who is currently serving a life sentence. (Defendants' Exh. G: Plaintiff's Depo., pg. 125). Plaintiff ultimately purchased the car for $350.00 from Michael Sims who said he purchased the car at an auction. (Id: pg. 126-28). Plaintiff received a bill of sale which he intended to mail in to receive the original title to the car, but became suspicious when 2 days before the shooting someone questioned him about the car. (Id: pg. 127-28). Plaintiff testified that before he was shot, someone in the other car yelled "Ay, that's my car." (Id: pg. 128).

injuries plaintiff may have sustained from the car wreck that Officer Galley told them about. (Id: ¶ 21).

An officer who was the driver of a patrol car applied pressure to the bullet wound, while another officer retrieved a first aid kit; the driver officer held a bandage to plaintiff's wound. (Id: ¶ 22). Officer Bronner held pressure to plaintiff's wound to staunch the bleeding, and held both of his arms, while a passenger officer held plaintiff's legs. (Id: ¶¶ 23-24). Defendants agree that plaintiff complained of the heat on the pavement, however, upon direction from Officer Bronner, an officer retrieved a yellow blanket from the trunk of Bronner's patrol car and slid it under plaintiff. (Id: ¶¶ 25-27). Although plaintiff estimated that he was on the pavement for 7 to 8 minutes, Officer Bronner estimates that from the time officers arrived on the scene until the blanket was retrieved, only a few minutes passed. (Id: ¶¶ 28-29). Defendants admit that plaintiff requested to be moved to the grass, but the request was denied; during his deposition, plaintiff testified that he believed the denial was based on the officers' attempt to avoid further injury to plaintiff. (Id: ¶¶ 31-33).

Sergeant Richard Sticken responded to the scene, but at the time of his arrival plaintiff was lying on a blanket, and he had no recollection of plaintiff complaining about the hot asphalt. (Id: ¶ 34). A fire truck and MAST ambulance arrived and plaintiff was transported to Truman Medical Center where he underwent surgery for 8 hours due to a severed brachial artery in his left arm. (Id: ¶¶ 36-39). On the day after surgery plaintiff permitted medical students to view the open gunshot wound; at that time, a doctor noticed burns and bags of pus on plaintiff's back. (Id: ¶¶ 41-42). Plaintiff was not then aware of the burns, and was discharged from the hospital after 4 days. (Id: ¶¶ 43-44).

## II. Discussion

A.   Standard of Review for Summary Judgment

Summary judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a jury in weighing the evidence, and in rendering credibility determinations. <u>Miskovich v. Independent School Dist. 318</u>, 226 F.Supp.2d 990, 1010 (D.Minn. 2002); <u>citing</u>, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986). Summary judgment is appropriate once the facts have been viewed, and the inferences have been drawn from those facts in a light most favorable to the non-moving party, and there is no triable issue. <u>Miskovich</u>, at 1010. For these purposes, a disputed fact is "material" if it must inevitably be resolved, and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Id</u>; <u>citing</u>, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Once the moving party files a properly supported motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute. <u>Id</u>, at 1011. In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in Fed.R.Civ.P. 56(e), must set forth specific facts showing that there is a genuine issue for trial." <u>Id</u>. Where the nonmoving party

6

has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the movant will be entitled to summary judgment. Id, quoting, Celotex Corp., 477 U.S. at 322.

B.  Excessive Force

In his amended complaint, plaintiff alleges that excessive force was used by Officers Bronner and Sartain in restraining him on hot asphalt while shirtless. He further alleges that the failure of the Board to instruct, supervise, and control the defendant officers caused the constitutional deprivation.

"The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person." Moore v. Indehar, 514 F.3d 756, 759 (8th Cir. 2008); quoting, Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998). A section 1983 action is supported when a police officer violates this constitutional right. Moore, at 759. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Moore, at 759; see also, Samuelson v. City of New Ulm, 455 F.3d 871, 875 (8th Cir. 2006); quoting, Graham v. Connor, 490 U.S. 386, 396 (1989). "To establish a violation of the Fourth Amendment in a section 1983 action, the claimant must demonstrate a seizure occurred and the seizure was unreasonable." Moore, at 759. When an officer restrains an individual's liberty through physical force or a show of authority, a Fourth Amendment seizure occurs. Id.

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. Kuha v. City of Minnetonka, 365 F.3d 590, 597 (8th Cir. 2003); see also,

7

Coleman v. Rieck, 253 F.Supp.2d 1101, 1106 (D.Neb.2003). However, proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. Kuha, at 597. In addition to the circumstances surrounding the use of force, the result of the force may also be considered. Littrell v. Franklin, 388 F.3d 578, 583 (8th Cir. 2004).

The terminology of excessive force seems strange here, but the case law confirms that we are dealing with a Fourth Amendment case, and that reasonableness in connection with the seizure and control of plaintiff is the focus of attention. A case most clearly in point is the "hot asphalt" litigation in Price v. County of San Diego, 990 F.Supp. 1230, 1241 (S.D.Cal. 1998). Although leaving plaintiff on hot asphalt, in connect with a detention, was complained of, the district judge, after a bench trial, ruled for defendants on that issue, largely because plaintiff "did not suffer burns". That indicated to the court that "it was not unreasonable to leave him lying on it for the short time he did."

The Price court noted that the asphalt issue was close to issues that might arise in prisoner cases, after the seizure had been fully completed. For instance, an issue of jailer indifference is often presented when physical complaints (alleged here) have been ignored too long. The Price court observed that comparable Due Process issues or Cruel and Unusual Punishment cases may seem close, but that the Supreme Court in Graham v. Connor, 490 U.S. 386 (1989) and the Seventh Circuit in Estate of Phillips v. City of Milwaukee, 123 F.3d 586 (1997) had insisted on use of a reasonableness test, under Fourth Amendment standards. Those cases involved, in part, inattention to a diabetic's alleged need for sugar while the subject of a police seizure and the alleged emergency

8

need for oxygen during another seizure. The main lesson in Graham was the objective reasonableness test, regardless of hostile or benign motivation. In the present case the intention of the officers would not be controlling, therefore, although presumably what they knew about the handling of prone detainees would have a bearing on resolving reasonableness.[5]

Reasonableness of the particular method of control must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and it must allow for the fact that police officers are often forced to make split-second judgments under circumstances that are tense, uncertain, and rapidly evolving. Kuha, at 597. Thus, the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances surrounding them, without regard to their underlying intent or motivation.

The evidence, viewed in the light most favorable to plaintiff, reveals that he did not resist arrest, did not attempt to flee from the officers, and did not pose a threat to the officers or others. It is undisputed that during the late afternoon of July 27, 2002, plaintiff was shot and sustained a bullet wound in his left arm that bled profusely. At the time of the shooting, plaintiff was wearing a tank top, shorts, socks and gym shoes; after being shot, he tore off the tank top to wrap it around the bullet wound to reduce the bleeding. Plaintiff attempted to flee the pursuing perpetrators by speeding away. The chase was observed by Officer Galley who pursued the vehicles until he lost sight of them; at that point, he put out a call on his radio about the chase. Officers Bronner and Sartain were alerted about the chase through the radio call.

---

[5]To use an extreme issue for illustration, a fact-finder might well conclude that an officer's understanding that injured people should generally not be moved, for fear of further damage, might result in an unreasonable seizure if a prone detainee were left unattended in the middle of a busy highway.

9

The stories diverge at this point. Officers Bronner and Sartain averred that upon arriving at 20th and Indiana Streets, they observed Officer Galley standing in the street near a man who was laying on the pavement, and they were advised by Officer Galley that plaintiff drove his car into a fence. (Defendants' Exh. C: Bronner Affidavit, ¶ 9; Exh. F: Sartain Affidavit, ¶ 11). It is upon this information that the officers base their explanation for holding plaintiff on the ground; that is, concern that plaintiff could sustain additional injuries. (Defendants' Exh. C, ¶ 15). Conversely, plaintiff claims that he did not crash his car, but, rather, he made a deliberate decision to stop his car and proceed on foot to escape the perpetrators. Toward this end, he parked his car next to a fence which he then scaled, scratching his stomach in the process, he then ran through a wooded lot into the street where he saw police officers driving down the street. (Plaintiff's Exh. E, pg. 164, 166-67).

Plaintiff contends that since he was not involved in a car wreck, there was no need to restrict his person on the hot asphalt. However, Officers Bronner and Sartain argue that such restriction was also necessary because plaintiff was bleeding heavily from the gunshot wound. In fact, Officer Sartain averred that he was taught that persons who are injured and bleeding should not be moved in most circumstances. (Defendants' Exh. F: Sartain Affidavit, ¶ 5).[6] Unless, of course, shots continue to be fired, in which case relocation for cover is the appropriate action to take. (Id). Thus, other dangers are to be considered, and a question remains whether, in view of the circumstances present in this case, the amount of force used by Officers Bronner and Sartain in holding plaintiff

---

[6]Presumably in support of this contention, defendants have provided the Kansas City, Missouri Police Department Procedural Instruction dated May 28, 1998, to be effective June 11, 1998. (Defendants' Exh. E). This document provides guidance for police officers involved in Ambulance Calls and Arrests Taken To Hospitals; however, it does not address the appropriate procedure to be utilized by an officer when confronted with the circumstances that unfolded at bar.

10

down on a hot pavement for some minutes before placing a blanket under him was objectively reasonable.

Plaintiff testified that he repeatedly told the officers the ground was hot, and notwithstanding his protestations, he was held on the ground for 7 to 8 minutes before a blanket was retrieved. (Plaintiff's Exh. E: pg. 174-75). It is noted that plaintiff testified as to his belief that the officers refused to permit him to move out of concern for his safety. (Defendants' Exh. G: Plaintiff's Depo. pg. 180). While this admission might tend to mitigate any intentional wrongdoing on the part of the officers, a question of fact remains as to whether it was objectively reasonable to wait 7 to 8 minutes before realizing that the intense heat of the ground could damage human skin, even after plaintiff had complained of pain from the heat.

Unlike the Price case from San Diego, there is significant evidence that due to the actions of Officers Bronner and Sartain, plaintiff sustained serious injury, as illustrated in the submitted photographs. Littrell, 388 F.3d at 583 (in addition to the circumstances surrounding the use of force, the result of the force may also be considered).[7] In the medical reports submitted, the attending physicians' notes repeatedly indicate the presence of blisters on the back of both of plaintiff's arms and buttocks. (Plaintiff's Exh. C). Raw red tissue was also noted on the back of plaintiff's left arm oozing a yellow fluid due to the 2nd degree burns he sustained from laying on the hot asphalt. (Id).

Based on this evidence, it is apparent that plaintiff sustained serious injury. Dawkins v. Graham, 50 F.3d 532, 535 (8th Cir. 1995) (plaintiffs' alleged injuries consisting of bruises, a facial laceration, hospitalization, and post-traumatic stress disorder, constituted actual injury); see also,

---

[7] Not that the level of injury is dispositive to the issue, for the Eighth Circuit has repeatedly refused to establish the threshold level of injury a person must suffer before officers may be held liable for using excessive force. Goff v. Bise, 173 F.3d 1068, 1074 (8th Cir. 1999).

Strandlund v. Hawley, 2007 WL 984268 (D. Minn. Mar. 30, 2007) (plaintiff's claim of a stiff neck for several weeks and loss of sleep resulting from outrage and embarrassment met the requisite showing of actual injury).

There are genuine issues of material fact as to whether a reasonable officer in the position of Officers Bronner and Sartain would have recognized that, in view of plaintiff's persistent complaints about the hot asphalt, continued restraint on the hot asphalt for 7 to 8 minutes was objectively unreasonable. Moore, 514 F.3d at 763; see also, Samuelson, 455 F.3d at 876 (a genuine issue of material fact exists concerning whether the amount of force used both in restraining plaintiff and after he was restrained was excessive). Thus, defendants' motion for summary judgment on plaintiff's § 1983 excessive force claim against Officers Bronner and Sartain will be denied. Burch v. Naron, 333 F.Supp.2d 816, 825 (W.D.Ark. 2004).

B.  Qualified Immunity As A Defense To Claim Of Excessive Force

The inquiry does not end with this determination, for a question remains as to whether plaintiff's right to be free from excessive force was clearly established. Defendants contend that plaintiff's claims are barred by qualified immunity because on the date of the incident, it was not clearly established that any officer or Board member violated plaintiff's constitutional rights. In determining whether plaintiff's right was clearly established, it must be decided "whether a reasonable official would understand his conduct violated" plaintiff's right to be free from excessive force. Moore, at 763; quoting, Henderson v. Munn, 439 F.3d 497, 503 (8th Cir. 2006).

Defendants state that there is little, if any, case law directly on point with the facts at hand. While research has revealed numerous cases of alleged constitutional violations where suspects

12

have been forced to the ground in order to effect a restraint with handcuffs, only one published case has been found where the injury occurred due to being forced onto hot asphalt.

Guidance may be found in the Ninth Circuit where a plaintiff alleged excessive force where he was left on hot asphalt. Price v. County of San Diego, 990 F.Supp. 1230, 1241 (S.D.Cal. 1998). Despite the high asphalt temperature, the court held that plaintiff's excessive force claim failed because he "did not suffer any burns." Price, at 1241. The court reasoned that the primary reason to avoid leaving someone on hot asphalt is that the person might sustain burns, but since that did not happen, it was not unreasonable to leave him on the asphalt for a short time. Id.

While the time is disputed here, the severity of injury creates a factual issue of excessive exposure to a heated pavement. The Price rationale tends to support plaintiff's version of what happened.

Under these circumstances, a reasonable jury could find that the force used, although not violent, was unconstitutional. Burch v. Naron, 333 F.Supp.2d at 825. Harmful restraint of a person in physical need is not a new concept in the law. Regardless of allegedly benign motivation, exposing a detainee to what amounts to physical torture hardly qualifies for immunity because of surprise. Thus, qualified immunity is not available to Officers Bronner and Sartain. The facts, of course, remain to be established and weighted by a fact-finder.[8]

---

[8]Counsel are advised that another judge will presumably try this case on the joint docket. I will consider a request for an early transfer, if counsel believe that would be helpful, as experience shows that a transferee judge is usually the trial judge.

13

C.  Failure To Train and Supervise

Plaintiff alleges that the defendant police officers were under the direction and control of the Board, and that the Board knew, or should have known of their unlawful conduct. A superior's liability under the Constitution for the failure to train or supervise a subordinate law enforcement officer is very limited. Owl v. Robertson, 79 F.Supp.2d 1104, 1114 (D.Neb. 2000). The elements of a typical failure to train or supervise claim are: (1) the defendant received notice of unconstitutional acts committed by a subordinate; (2) the defendant demonstrated deliberate indifference to the offensive acts; (3) the defendant failed to take sufficient remedial action to train or supervise the offending subordinate; and (4) such failure proximately caused the injury. Id.

Section 1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights. Owl, at 1114. Even if the failure to train or supervise caused the harm, there still must be a showing that the supervisor was "deliberately indifferent" to the constitutional principles at stake. Id., at 1115.

Plaintiff claims an inability to establish his claim under this theory because of defendants' failure to provide requested discovery, specifically, copies of the personnel files of the officers involved. Contrary to plaintiff's contention, this is an insufficient basis upon which an opposition to summary judgment can be mounted. Since the inception of this action in July of 2006, plaintiff has not engaged the court in his quest for information from defendants - either by motion or letter. Further, Fed.R.Civ.P. 56(f) provides that when a party opposing a motion for summary judgment cannot present facts essential to the justification of its opposition, that party may show such circumstances by way of an affidavit stating specific reasons. Here, plaintiff has not included an affidavit in his pleadings, and, therefore, fails to show that the Board had notice of the complained

14

of conduct and was deliberately indifferent to the consequences. Thus, summary judgment will be granted as to this claim.

Accordingly, it is hereby

ORDERED that defendants' second motion for summary judgment (ECF doc. 47) is GRANTED as to Count IV, DENIED as to Counts I and II, and Count III is dismissed without prejudice.

      /s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

June 18, 2008

Kansas City, Missouri